IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINCENT SPRUELL,<br><br>        Petitioner,<br><br>  v.<br><br>A.P. KANE, Warden,<br><br>        Respondent.<br>_____ / | No. C 05-5183 MMC (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

On December 14, 2005, petitioner Vincent Spruell, a California prisoner proceeding pro se, filed the above-titled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the decision by the Board of Prison Terms ("Board") denying him parole in 2004. On May 25, 2006, the Court ordered respondent Warden Kane to show cause why the petition should not be granted based on petitioner's cognizable claim for relief. Respondent filed an answer accompanied by a memorandum and exhibits, and petitioner filed a traverse. Having read and considered the parties' respective submissions, the Court rules as follows.

**BACKGROUND**

In 1983, in Merced County Superior Court, petitioner was convicted of second-degree murder and assault with a firearm. He was sentenced to a term of seventeen years to life in state prison. On November 20, 2004, petitioner appeared before the Board for his sixth

parole suitability hearing. At the hearing, to establish the facts of petitioner's commitment offense, the Board relied upon the following statement of facts from the appellate decision in petitioner's criminal case:[1]

> On July 31st, 1983, Raul Lopez and Frank Trevino were at a party at the home of Sammy Samaniego, in Merced. They left the party around 9:00 p.m. A short time later, they were walking to the home of Lopez's mother when they exchanged words with Wyatt Turner, a black male who was riding on a bicycle. A group of 12 to 14 black males started to approach Lopez and Trevino while making rude or insulting comments to them. Lopez noted defendant or the prisoner leaning against a white Lincoln Continental, and he identified three other black males standing with the defendant, Michael Turner, Tyrone Turner, and Darrell Turner. Words were exchanged and a fight started.
>
> Lopez was fighting with the defendant and one Darrell High, while Trevino fought Darrell Turner and someone else Lopez did not recognize. The fist fight between Lopez and the defendant lasted about 10 seconds before the defendant took a step backwards and pulled out a gun. He fired and hit Lopez. Lopez told Trevino he had been shot, and Trevino came to his aid. With Trevino supporting Lopez, they were leaving the crime scene when Trevino suddenly let go of Lopez and knelt on the ground holding his wrist.
>
> As Lopez and Trevino first ran from the scene, Lopez heard three shots fired, which he thought were from two different guns. More shots were fired as Lopez turned to look back at Trevino. Lopez saw defendant point his gun and fire several shots. When Trevino fell straight back, Tyrone Turner jumped into the Continental and pulled the seat forward. Defendant jumped into the back seat. More shots were fired from the Continental before a group of men came to the scene from a nearby park and started hitting the car with sticks and bumper jacks. Lopez heard breaking glass and saw Michael Turner driving away in the Continental. Defendant was in the rear seat with one of two other black males, including Tyrone Turner.
>
> Lopez and Trevino were taken to the hospital where Trevino soon died. Lopez then told the police at the hospital there would be a revenge, and there was going to be a war. Lopez testified he did not observe any physical injuries to defendant. He stated he himself had no weapon since he was on parole and was only on his way to his mother's house to borrow some money. He did not know any of the men who came to the fight scene from the park area. He did not see either Angel Gloria, or Angel Torres, at the fight scene, although he had seen Torres some five minutes later.
>
> Criminalist William Chisum concluded on his examination of the two bullets removed from Trevino's body at the autopsy that one, Trevino had been struck in the wrist by a 32-caliber bullet, and two, the fatal head wound was the result

---

[1]In the hearing record, the statement of facts is transcribed as one continuous paragraph in excess of three pages in length. It has been separated into shorter paragraphs for purposes of this order. Additionally, the Board's spelling the name of each individual referenced in the statement of facts, a practice followed for the assistance of the transcriber, has been omitted.

2

of a 25-caliber weapon. Merced Police Officer James Slate found a spent 25-caliber cartridge in the Continental which had been driven by Michael Turner on July 31st.

(See Answer Ex. C at 7:25-10:27.)

At the conclusion of petitioner's hearing, the Board determined petitioner was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison at this time." (See id. at 71:10-13). The Board denied petitioner parole for one year.

Petitioner filed a petition for a writ of habeas corpus in the Superior Court challenging the Board's decision. The Superior Court ruled on the petition as follows:

> It is clear that there are some facts that would support the Board's findings of petitioner's unsuitability for parole. The Board clearly recited some concerns for public safety should petitioner be released on parole. The court has read petitioner's informal response no less than three times and finds that the arguments set forth do not address any errors in the Board's findings.
>
> The court finds no error in the Parole Board's decision or proceedings. The writ of habeas corpus is denied in all respects.

(See Answer Ex. D at 2.) Petitioner next filed a petition for a writ of habeas corpus in the California Court of Appeal, which summarily denied the petition. (See Answer Ex. E.) Petitioner then filed a petition for review in the California Supreme Court, which denied review. (See Answer Ex. F.) Petitioner thereafter filed the instant petition, in which he claims the Board violated his federal constitutional right to due process by denying him parole without sufficient evidence to support its decision that his release would pose an unreasonable risk to public safety.

**DISCUSSION**

**A.   Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a habeas petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

3

Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." See 28 U.S.C. § 2254(d). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

A decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." See Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). An "unreasonable application" of federal law occurs "if the state court identifies the correct governing legal principle from the [Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." See id. at 75. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." Id. "The state court's application of clearly established law must be objectively unreasonable." Id. An "unreasonable determination of the facts" occurs where "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record" or "that the state court's fact-finding process was adequate." See Taylor v. Maddox, 366 F.3d 992, 1000 (2004).

In determining whether to grant a petition, a federal court must analyze the state court's "last reasoned decision." Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). Here, the "last reasoned decision" is the Superior Court's order of May 5, 2005. (See Answer Ex. E.)

**B.     Subject Matter Jurisdiction**

Respondent asserts that the instant petition should be dismissed for lack of subject matter jurisdiction, because petitioner has no constitutionally protected liberty interest in parole.

While there is "no constitutional or inherent right of a convicted person to be

4

1  conditionally released before the expiration of a valid sentence," Greenholtz v. Inmates of
2  Nebraska Penal & Corr. Complex, 442 U.S. 1, 7 (1979), a state's statutory parole scheme, if
3  it uses mandatory language, may create a presumption that parole release will be granted
4  when, or unless, certain designated findings are made, and thereby give rise to a
5  constitutionally protected liberty interest. See Board of Pardons v. Allen, 482 U.S. 369, 376-
6  78 (1987) (finding Montana parole statute creates due process liberty interest in release on
7  parole); Greenholtz, 442 U.S. at 11-12 (finding Nebraska parole statute creates due process
8  liberty interest in release on parole).  In such a case, a prisoner gains a legitimate expectation
9  in parole that cannot be denied without adequate procedural due process protections.  See
10 Allen, 482 U.S. at 373-81; Greenholtz, 442 U.S. at 11-16.  In McQuillion v. Duncan, 306
11 F.3d 895 (9th Cir. 2002), the Ninth Circuit held that, under the clearly established framework
12 of Greenholtz and Allen, "California's parole scheme gives rise to a cognizable liberty
13 interest in release on parole."  See id. at 902.

14      Relying on the Supreme Court's decision in Sandin v. Conner, 515 U.S. 472 (1995),
15 respondent argues that the Ninth Circuit improperly applied Greenholtz and Allen to find a
16 protected liberty interest in McQuillion.  Respondent's argument is without merit.  In Sandin,
17 the Supreme Court criticized the "mandatory language" methodology used in Greenholtz and
18 Allen, and held that, while states may under certain circumstances create liberty interests that
19 are protected by the Due Process Clause, "these interests will be generally limited to freedom
20 from restraint which . . . imposes atypical and significant hardship on the inmate in relation
21 to the ordinary incidents of prison life."  515 U.S. at 484.  In McQuillion, the Ninth Circuit
22 squarely addressed, and rejected, the contention that Sandin applies to parole regulations.
23 See McQuillion, 306 F.3d at 902-04.  In particular, the Ninth Circuit held:  "It is clear from
24 the [Supreme] Court's framing of the problem in Sandin . . . that Sandin's holding was
25 limited to internal prison disciplinary regulations."  Id. at 904; see also Sass v. California Bd.
26 of Prison Terms, 461 F.3d 1123, 1127 n.3 (9th Cir. 2006) ("Despite the government's
27 argument that [Sandin] eliminated the 'mandatory language' approach of Greenholtz and
28 Allen, the Supreme Court did not so hold and this court has consistently rejected this

1  argument.").

2  Respondent further argues that the California Supreme Court's decision in In re
3  Dannenberg, 34 Cal. 4th 1061 (2005), established that California's parole regulations do not
4  create a protected liberty interest.  The Ninth Circuit rejected this argument in Sass, finding
5  Dannenberg addressed only "the narrow question whether the Board must engage in a
6  comparative proportionality analysis in setting parole dates before determining an inmate's
7  individual suitability for parole." 461 F.3d at 1128.  Consequently, the Ninth Circuit
8  concluded, "Dannenberg does not explicitly or implicitly hold that there is no constitutionally
9  protected liberty interest in parole," id., and "California inmates continue to have a liberty
10 interest in parole after [Dannenberg]," id. at 1125.

11 Accordingly, petitioner was entitled to the protections of due process at his parole
12 suitability hearing, and the Court has subject matter jurisdiction over the petition.

13 **C.     Petitioner's Claim**

14 Petitioner contends that the Board violated his right to due process by denying him
15 parole, because the Board's decision was not supported by some evidence.

16 According to "clearly-established" federal law, a parole board's decision must be
17 supported by "some evidence" to satisfy due process.  See id. at 1128-29.  "[The] some
18 evidence standard is minimal, and assures that 'the record is not so devoid of evidence that
19 the findings of the disciplinary board were without support or otherwise arbitrary.'"  Id. at
20 1129 (quoting Superintendent v. Hill, 472 U.S. 445, 457 (1985)).  "To determine whether the
21 some evidence standard is met 'does not require examination of the entire record,
22 independent assessment of the credibility of witnesses, or weighing of the evidence.'"  Id. at
23 1128 (quoting Hill, 472 U.S. at 455-56.)  "Instead, the relevant question is whether there is
24 any evidence in the record that could support the conclusion reached'" by the Board.  See id.
25 (quoting Hill, 472 U.S. at 455-56.)

26 When assessing whether a state parole board's suitability determination was supported
27 by "some evidence," the Court's analysis is framed by the statutes and regulations governing
28 parole suitability determinations in the relevant state.  Irons v. Carey, 505 F.3d 846, 850 (9th

6

Cir. 2007). In California, the criteria for determining whether a life prisoner is suitable for parole are set forth at title 15, § 2402, of the California Code of Regulations. The opening paragraph of § 2402(a) states: "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2402(a). In determining suitability for parole, the Board must consider "all relevant, reliable information" available to it. Id. § 2402(b).

Circumstances tending to indicate unsuitability for parole include whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. § 2402(c). Factors to be considered in determining whether such circumstance is present include: the number of victims; whether "[t]he offense was carried out in a dispassionate and calculated manner"; whether the victim was "abused, defiled or mutilated during or after the offense"; whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering"; and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id. Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. See id.

Circumstances tending to support a finding of suitability for parole include: no juvenile record; a stable social history; signs of remorse; the crime was committed as a result of significant stress in the prisoner's life; a lack of criminal history; a reduced possibility of recidivism due to the prisoner's present age; the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; and the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. See id. § 2402(d).

In the instant case, the Board's denial of parole was based in part on findings that petitioner posed an unreasonable risk of danger to public safety because "the crime was carried out in a violent and brutal manner," and "in a manner which demonstrates a disregard

7

1    for human life." (See Answer Ex. C at 71:14-19.) The Board had "some evidence" to
2    support its findings, based on evidence before it that showed two victims were attacked,
3    multiple shots were fired, both victims were shot and one was killed, the shootings might
4    have been gang-related, and there was no evidence that showed petitioner had acted in self-
5    defense, even though he claimed he started shooting because one of the victims (Lopez) had
6    stabbed him while they were fighting. (See id. at 71:15-72:15.)

7          The Board's finding that petitioner posed an unreasonable risk of danger to public
8    safety was based further on evidence that petitioner, who was not the lone shooter, had never
9    assisted law enforcement in any way with identifying the other shooter, who was responsible
10   for the fatal shot that killed the second victim, Trevino. (See id. at 75:14-76:5.) The Board
11   noted that petitioner's lack of cooperation not only placed the public at risk (because the
12   shooter might still be out on the streets harming others), it also raised the concern whether
13   petitioner might reestablish a relationship with the shooter once he was released on parole to
14   the same community. (See id. at 76:6-15.) Although the Board felt petitioner was "definitely
15   headed in the right direction," (see id. at 75:8), his failure to cooperate with law enforcement
16   on this matter made the Board "very uncomfortable." (See id. at 75:24-25, 76:24-25.) Based
17   on the Board's legitimate concern that petitioner might return to the community and
18   reestablish contact with the shooter, "some evidence" supported the Board's finding that
19   petitioner continued to pose an unreasonable risk of danger to public safety.

20         The Board also considered petitioner's previous record of violence and criminal
21   history, see Cal. Code Regs. tit. 15, § 2402(c)(2), and based its denial of parole in part on
22   findings that petitioner had a criminal history of violent and assaultive behavior, and that he
23   had failed to benefit from previous periods of probation and county jail time. (See Answer
24   Ex. C at 73:11-17.) Based on evidence that petitioner, who was nineteen years old when he
25   was convicted, had a juvenile record of offenses including battery, child molesting,
26   trespassing on school grounds, petty theft, violation of curfew, and assault with great bodily
27   injury, and that he had failed to successfully complete probation, there was "some evidence"
28   to support the Board's findings. (See id. at 73:17-74:3; see also Answer Ex. B (Probation

Report) at 7-9.)

The Board further considered petitioner's social history, see id. § 2402(c)(3), and found he had a history of unstable relationships with others. (See Answer Ex. C at 74:13-14.) The Board does not specifically state what evidence it relied upon to reach this conclusion. However, based on evidence before the Board that petitioner was involved in a gang at the time of the offense and that the offense might have been gang-related, there was "some evidence" to support the Board's finding. (See id. at 71:19-24; Ex. B at 2-6, 16.)

The Board also considered the statement made at the hearing by a representative of the Merced County District Attorney's Office in opposition to petitioner's release on parole. See Cal. Penal Code § 3046(c) (providing Board shall consider all statements and recommendations submitted by judge, district attorney, sheriff, and other persons interested in granting or denying of parole). (See Answer Ex. C at 60:8-63:7, 74:11-14.)

The Board acknowledged the favorable reports petitioner had received from prison psychologists and counselors, commended his vocational, educational, and self-help program achievements while in prison, praised his lack of disciplinary write-ups since 1992, and noted his realistic release plans. (See id. at 74:3-24.) The Board concluded, however, that "these positive aspects of [petitioner's] behavior do not outweigh the factors of unsuitability." (Id. at 74:25-26.)

Petitioner contends that the Board's continued reliance on the nature of the commitment offense and other unchanging factors to deny him parole violates due process. (See Pet. at 8-9, 13-14.) The Ninth Circuit has held, however, that a denial of parole based on an unchanging factor, such as the gravity of the offense, may constitute "some evidence" to justify a denial of parole. See Irons, 505 F. 3d at 853 (holding Board's sole reliance on commitment offense in denying parole comported with due process); Sass, 461 F.3d at 1129 (holding Board's reliance "on the gravity of [petitioner's] convicted offenses" in combination with his prior offenses "constitute[d] some evidence to support the Board's determination"); Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003) ("[T]he parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of

9

parole can be initially justified as fulfilling the requirements set forth by state law.") Although the Ninth Circuit, in Biggs, stated that "[a] continued reliance in the future on an unchanging factor . . . runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation," see Biggs, 334 F.3d at 917, this exception has never been applied by the Ninth Circuit. In petitioner's case, the Board properly relied upon the gravity of the commitment offense, petitioner's failure to provide information regarding Trevino's shooter, and petitioner's criminal and social histories as "some evidence" to deny petitioner parole.

Lastly, other circumstances presented in the instant action are not materially distinguishable from those found not to warrant the granting of a habeas petition in Irons, Sass, and Biggs. Here, petitioner argues he had received no disciplinary infractions for more than ten years, had made laudable achievements in educational, vocational, and self-help programs, and had viable release plans. The petitioner in Irons was "extremely industrious" in prison, maintained "average to exceptional job performance in every position he ha[d] occupied," and "received certificates of completion in several vocational training programs." See Irons, 505 F. 3d at 849. Likewise, in Sass, the petitioner displayed "exemplary conduct in prison," had "detailed plans" for his release, received vocational training and certificates, and "had taken college classes, for which he received all A's except for one B minus." See Sass, 461 F.3d at 1136 n.16 (Reinhardt, dissenting). Similarly, the petitioner in Biggs was a "model inmate," received praise from his supervisors for his "skills and efforts," received certification from the FAA in two aviation programs, and earned Associate's, Bachelor's and Masters in Business Administration degrees. See Biggs, 334 F.3d at 912. The Ninth Circuit nonetheless found the petitioners' accomplishments in Irons, Sass, and Biggs insufficient to require a grant of parole. See Irons, 505 F. 3d at 853; Sass, 461 F.3d at 1129; Biggs, 334 F.3d at 916.

In sum, the Court finds the Board had "some evidence" to support its decision to deny petitioner parole, see Sass, 461 F.3d at 1129. Moreover, the Superior Court's decision upholding the Board's denial was not "contrary to" or an "unreasonable application of"

10

clearly established federal law, or "an unreasonable determination of the facts in light of the evidence presented" in the state court proceedings.  See 28 U.S.C. § 2254(d).  Accordingly, the petition for a writ of a habeas corpus will be denied.

## CONCLUSION

For the reasons set forth above, the petition for a writ of a habeas corpus is hereby DENIED.

The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

DATED: December 7, 2007

_____
MAXINE M. CHESNEY
United States District Judge